**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

S.T., *et al.*,

              \*

   Plaintiffs,

              \*

   vs.           Civil Action No.   AW-08-3159

              \*

JERRY D. WEAST, *et al.*,

              \*

   Defendants.

          \*\*\*\*\*\*

## MEMORANDUM OPINION

Currently pending before this Court are the parties' Cross-Motions for Summary Judgment (Doc. Nos. 17 & 18) in this appeal of the Administrative Law Judge's decision concerning Montgomery County Public School's alleged violations of the Individuals with Disabilities Education Improvement Act ("IDEA").  The Court held a hearing on these motions on March 8, 2010, and has reviewed the entire record as well as the pleadings with respect to these motions.  For the reasons discussed below, the Court **DENIES** Plaintiffs' Motion for Summary Judgment and **GRANTS** Defendants' Motion for Summary Judgment.

## FACTUAL BACKGROUND

This case is before this Court on appeal of Administrative Law Judge ("ALJ"), Michael D. Carlis's, finding that Montgomery County Public Schools ("MCPS") neither violated the procedures governed under IDEA nor denied S.T.[1] a free and appropriate public education ("FAPE").  The facts are taken from review of the administrative record and the briefs on cross motions for summary judgment.

---

[1] To protect the minor child at issue in this matter, the Court will refer to her, and her parents, by their initials throughout this Memorandum Opinion.

S.T. is a twelve-year-old student initially classified with a speech and language impairment, and later mental retardation,[2] which makes her eligible to receive special education services. She attended kindergarten through fifth grade at Brooke Grove Elementary ("Brooke Grove") in Montgomery County, Maryland, where she received special education instruction in self-contained classrooms, meaning only with other disabled children, in all academic areas as well as art, music, and physical education. S.T. also received speech/language and occupational therapy. During her tenure at Brook Grove, S.T. went to lunch and recess with non-disabled students with special education support.

Between 2005 and 2006, S.T.'s third and fourth grade, her Maryland School Assessment ("MSA") scores decreased from 287 to 240 in reading and 327 to 301 in math. Ms. Stevens, S.T's fifth grade teacher, acknowledged that S.T. had only made two and a half years of reading progress during her six years at Brooke Grove, but that she also met, or made progress towards, all of her fifth grade individualized education program ("IEP") goals and improved her MSA scores between fourth and fifth grade. In May 2006, the Children's National Medical Center ("Children's") conducted a Neuro-Psychological Evaluation of S.T. and concluded that she would benefit from a highly structured and individualized approach in a classroom with a small student-to-teacher ratio and with a systematic step-by-step approach with review and repetition. The report stated that S.T. could benefit from attending nonacademic subjects with nondisabled students, referred to as mainstreaming, due to her relative strength in social skills with the help of an individual aide. The report also recommended the exploration of alternative schools for S.T. and discussed that she should not be in a class with students possessing emotional or behavioral issues.

---

[2] S.T. was born prematurely and subsequently suffered development delays. Her disability classification was changed to mental retardation in 2006 to more completely reflect her needs.

In November 2007, during her fifth grade year, S.T.'s parents contacted Dr. Laura Solomon, who is a private educational consultant and evaluator.  Dr. Solomon conducted a series of tests on S.T., at some point between February and March 2007, and found that her scores had decreased from previously administered tests.  For instance, S.T.'s scores on the Woodcock-Johnson Test of Achievement III ("WJ III"), administered in 2004 and 2007, reflected a drop in her overall achievement score from 66 to 51, her broad reading score from 74 to 61, and her broad math score from 77 to 58.  Ms. Stevens explained that younger students tend to obtain higher scores on this test.  Because of S.T.'s performance during Dr. Solomon's evaluation, Dr. Solomon concluded that S.T. had not made progress while at Brooke Grove and recommended intensive instruction in all academic subjects, which possibly would require a nonpublic school placement.

On May 15, 2007, an IEP meeting was held to determine S.T.'s special education needs and placement for the sixth grade.  The following attended the meeting: Mr. and Mrs. T, S.T.'s parents; Dr. Solomon, the parents' educational advocate; Ms. Stevens, a special educator and S.T.'s fifth grade teacher at Brooke Grove; Linda McDaniel, principal of Brooke Grove; Patrick Devine, special education supervisor at Farquhar Middle School ("FMS"); John Hilly, special education coordinator at FMS; Cathy Angel, special educator at Brooke Grove; Anne Willis, S.T.'s speech and language therapists at Brooke Grove; Amy Katzman, S.T.'s occupational therapist at Brooke Grove; Nicole Hopper, representative from Rosa Parks Middle School; Rona Dixon, Brooke Grove psychologist; Sabrina Finlay, pupil personnel worker; and Bob Zorr, general educator at Brooke Grove.  The written IEP form for S.T.'s sixth grade year, filled in at the May meeting, states that S.T. would receive thirty (30) hours of self-contained special education services, which means that her entire school week would remove her from the general

3

student population.  Moreover, the May written IEP provides that "this amount of removal from general education is very restrictive but the team felt that [S.T.] requires it in order to progress with academic and functional skills."  (Bd. Ex. 17.)  Ms. Stevens handwrote notes during the May IEP meeting, and stated that she "believe[d] that adapted/supported classes are available . . . at FMS and [S.T.'s] needs can be met at FMS."  (*Id.*)  However, no other disagreement was recorded.  Mr. Hilly, the special education coordinator at FMS, appears to have left the meeting early and before the team could ask questions about the special education support at FMS for elective classes, physical education, and lunch.  At the conclusion of the May meeting, the May IEP was referred to a central individualized education program ("CIEP") meeting scheduled for July 9, 2007.

Between the May and July IEP meetings, it appears that MCPS contacted Mr. Hilly to determine what special education services FMS had for elective courses, physical education, and lunch.  Mr. Hilly informed Ms. Angel and Mr. Devine that FMS had a physical education teacher qualified as an adaptive physical education coordinator and that a special education assistant accompanied those students in the self-contained FMS class to lunch and electives.  The self-contained special education classroom at FMS has a primary teacher and two assistants for approximately 12 students.  Apparently, those two assistants accompany the self-contained special education students to and from lunch and their other elective courses.  MCPS then presented this information at the July 2007 CIEP meeting and asserted that S.T. needed only 22.5 hours of self-contained special education with the remaining 7.5 hours available for S.T. to be mainstreamed during lunch and elective courses with the aid of the special education assistant.  Therefore, MCPS concluded that FMS would be an appropriate placement for S.T.'s special education needs.  Unconvinced that S.T.'s needs could be met at FMS; S.T.'s parents enrolled

her in Ivymount, which is a private special education school, where she is currently attending. The parents represent that she is making significant progress at Ivymount.

On May 21, 2008, the parents appealed the decision of the July CIEP meeting and requested a determination that MCPS violated IDEA by predetermining S.T.'s placement and thus denied S.T. a ("FAPE"), and the ALJ determined that no violation had occurred. The parents appealed the decision of the ALJ to this Court on November 24, 2008. The parties filed Cross Motions for Summary Judgment. The parents are seeking a declaration that MCPS violated IDEA and denied S.T. a FAPE and are asking that the Court to order MCPS to reimburse S.T.'s tuition at Ivymount and costs associated with bringing this lawsuit. MCPS seeks to have this Court uphold the ALJ's decision.

## STANDARD OF REVIEW

### I.   Standard of Review for Summary Judgment

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). When parties file cross motions for summary judgment, the Court must view each motion in the light most favorable to the non-movant. *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). While the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330-31 (4th Cir. 1998). Additionally, hearsay statements or conclusory

statements with no evidentiary basis cannot support or defeat a motion for summary judgment. *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

## II.      Standard of Review of ALJ Decisions in IDEA Cases.

Under the IDEA statute, a party aggrieved by the findings of an administrative hearing concerning the school boards compliance with the provisions of IDEA may appeal to a federal district court.    20 U.S.C. § 1415(i)(2)(A) (2006).    The district court then reviews the administrative record, hears additional evidence if requested by a party, and upon a preponderance of the evidence showing grants the relief the court deems appropriate.   *Id.* at § 1415(i)(2)(C).   In determining whether a school board complied with the provisions of the IDEA statute, the district court: (1) determines whether the "State complied with the procedures [of IDEA]," and (2) evaluates whether "the [IEP] developed through the [IDEA] procedures [is] reasonably calculated to enable the child to receive educational benefits."   *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982).   As with an administrative hearing, the burden of proof in establishing a violation of IDEA falls on the party challenging the administrative findings, often the parents of the disabled child.   *See Barnett v. Fairfax County Sch. Bd.*, 927 F.2d 146, 152 (4th Cir. 1991).

The Fourth Circuit has instructed its district courts reviewing IDEA cases, "to make an independent decision based on a preponderance of the evidence, while giving due weight to state administrative proceedings."   *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 103 (4th Cir. 1991).   "If the administrative findings were made in a regular manner and have evidentiary support, they are to be considered *prima facie* correct."   *Wagner v. Bd. of Educ.*, 340 F. Supp. 2d 603, 611 (D. Md. 2004) (quoting *Cavanagh v. Grasmick*, 75 F. Supp. 2d 446, 457 (D. Md. 1999) (explaining that a district court must explain its departure from the findings in the administrative

record)). In determining whether the factual findings were proper, the district court should not "substitute [its] own notions of sound educational policy for those of the school authorities." *Cavanagh*, 75 F. Supp. 2d at 457. Instead, the district court should focus on whether the process through which the factual findings were made is consistent with "the accepted norm of a fact-finding process." *J.P. v. County Sch. Bd.*, 516 F.3d 254, 259 (4th Cir. 2008) (explaining that the ALJ had engaged in normal fact-finding process where he heard testimony and considered evidence offered by both parties and did not arrive at his decision by "flipping a coin, [or] throwing a dart"). As part of the district court's obligation to give "due weight" to the findings of the ALJ, the court should defer to the ALJ's decision on the credibility of witnesses. *Justin G. ex rel Gene R. v. Bd. of Educ.*, 148 F. Supp. 2d 576, 587 (D. Md. 2001) (stating that "the fact finder who has the advantage of hearing the witnesses is in the best position to assess credibility").

## ANALYSIS

The purpose of the IDEA statute is to ensure that children with disabilities are provided a "free appropriate public education" ("FAPE").[3] *Rowley*, 458 U.S. at 201 (citing 20 U.S.C. § 1412(1) (1994)). A school receiving federal education funding meets its requirement to provide disabled children with a FAPE when it develops, in conjunction with the child's parent, an IEP that is "reasonably calculated to enable the child to receive educational benefits." *Justin G.*, 148 F. Supp. 2d at 582. However, IDEA does not require that schools provide "a disabled child with the best possible education" as long as the plan provides something more than trivial educational benefits. *MM ex rel DM v. Sch. Dist.*, 303 F.3d 523, 526 (4th Cir. 2002) (citations omitted). The IDEA statute outlines procedural requirements to be followed by the school to ensure that

---

[3] FAPE is defined as "special education and related services that (1) are provided at public expense, under public supervision, and without charge; (2) meet the standards of the State's educational agency; (3) include an appropriate preschool, elementary school, or secondary school . . . in the State involved; and (4) are provided in conformity with the [student's IEP]." § 1401(9).

parents or guardians of disabled children are "notified of decisions affecting their child[ren] and given an opportunity to object to these decisions." *Id.* at 527.

After the child is evaluated and categorized as disabled, the school must develop an IEP for each child which is developed during an IEP team meeting which consists of "a representative of the school district, the child's teacher, the parents or guardians, and where appropriate, the child." § 1414(d)(1)(B). The parents must be notified of any changes with respect to their child's IEP and must be given the opportunity to participate in discussions involving their child's services. *See* § 1414(d)(3)(F). The IEP must also be written and contain the following:

(i)    a statement of the child's present levels of educational performance . . . ;

(ii)   a statement of measurable annual goals . . . ;

(iii)  a description of how the child's progress toward meeting the annual goals . . . will be measured . . . ;

(iv)   a statement of special education and related services and supplementary aids and services . . . provided to the child;

(v)    an explanation of the extent, . . . the child will not participate with nondisabled children . . . ;

(vi)   a statement of individual appropriate accommodations . . . ;

(vii)  the projected date for the beginning of the services . . . , and the anticipated frequency, *location*, and duration of those services . . . ;" and

(viii) [postsecondary opportunities for students over sixteen].

§ 1414 (d)(1)(A) (emphasis added). Essentially the IEP process requires that the team access the needs of the child, develop measurable goals to be obtained in a given year, determine the services that are needed to help the child meet those goals, and then identify a physical placement for the child that can provide those services in the least restrictive environment.[4]

---

[4] The least restrictive environment means that to the maximum extent possible the child should be educated with his or her nondisabled peers. § 1412(a)(5)(A).

8

In the Fourth Circuit, in order to obtain relief during an administrative hearing of a school's procedural violation, the violation must actually interfere with the school's ability to provide a FAPE.  *DiBuo ex rel. DiBuo v. Bd. of Educ.*, 309 F.3d 184, 190 (4th Cir. 2002).  In relevant part, 34 C.F.R. § 300.513(a)(2)(ii) (2009) states that "in matters alleging a procedural violation, a hearing officer may find that a child did not receive a FAPE only if the procedural inadequacies . . . significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE . . . ."  *See also* 20 U.S.C.A. § 1415(f)(3)(E) (Supp. 2008).

Here, the parents of the disabled child in question argue that their child was denied a FAPE because the school significantly impeded their opportunity to participate in the decision-making process when MCPS allegedly changed the number of hours S.T. needed in self-contained classrooms between the May and July IEP meetings to fit a public school placement, an unlawful process known as predetermination.  Thus, the Court must determine if the ALJ engaged in an irregular fact-finding process or made legal errors in arriving at his decision that MCPS did not violate the procedures of IDEA and did not deny S.T. a FAPE.

I.      **Procedural Violations of IDEA**

As an initial matter, the Court is reminded of its obligation to accord due weight to the findings of the ALJ in these matters, and that such decisions are considered prima facie correct, unless a review of the record provides some evidence that the ALJ's findings were irregular.  Accordingly, the Court need only review the administrative record to determine whether the ALJ engaged in a regular fact-finding process when he decided that MCPS did not violate the procedures of the IDEA statute by predetermining S.T.'s sixth grade placement and that it did not deny her parents an opportunity for meaningful participation in the IEP process.  The ALJ weighed all of the testimony and evidence presented by both parties during the due process

hearing and found that there had been no agreement at the May IEP meeting that S.T. needed to be self-contained for the entire school day and that the July meeting was a continuation of the May IEP meeting, which involved the participation of S.T.'s parents.

As grounds for his decision, the ALJ explained that he was satisfied "based on the consistency of testimony among MCPS' witnesses, and [his] observation of their demeanor during their testimony, that there was no consensus at the May meeting that S.T. needed a fully self-contained special education program and that what Ms. Angel had written on the [May] IEP was misleading and a mistake." (ALJ Decision 29.) Specifically, the ALJ was persuaded by the testimony of Ms. Stevens, Ms. Willis, Ms. Katzman, and Ms. Angel, on their beliefs about the benefit of mainstreaming S.T. in some areas. The ALJ explained that although her parents were concerned about her social immaturity, the individuals who had worked with S.T. in a school setting all testified that she would benefit from exposure to her nondisabled peers. The ALJ also stated that the fact that no disagreement was recorded at the May meeting did not dissuade him that the school officials believed that S.T. could benefit from mainstreaming, especially because the witnesses who took notes at the May meeting explained why the disagreement was not recorded.

The ALJ pointed to the testimony of Ms. Stevens, S.T.'s fifth grade special education teacher, "that throughout her career [of] working with hundreds of disabled students . . .  she had never seen a child more appropriate for being able to have the opportunity to be with nondisabled peers as [S.T.] . . . ." (Hr'g Tr. 518:22-519:2.) Moreover, Ms. Stevens testified that "[because S.T.] was flourishing and social all throughout her academic career at Brooke Grove, there was never any indication to us that [mainstreaming] was not an appropriate and best program for her." (Hr'g Tr. 519:4-8.) Ms. Willis, S.T.'s speech and language therapist, testified that she

"[thought S.T.] would benefit from being . . . in the mainstream with general [education] kids and being exposed to some of those nuances of peers her own age," and that she "[did not] believe that [S.T.] should be segregated for [lunch and physical education] because of how well she did at Brooke Grove." (Hr'g Tr. 672:14-17.)  As an example, Ms. Willis explained that S.T. would be sent to run errands for her teachers.  Ms. Katzman, S.T.'s occupational therapist, testified that "[S.T.] is probably one of the strongest I have ever seen as far as her ability to be socially appropriate [in the learning center]." (Hr'g Tr. 714:9-11.)  Lastly, Ms. Angel, who supported S.T. and her teachers at Brooke Grove, testified that she "felt very strongly that [S.T.] would have received a lot of benefit from having access to her typical peers." (Hr'g Tr. 791:21-23.)  All of these individuals testified that they expressed their view at the May IEP meeting. Furthermore, the ALJ explained that the parents had the opportunity to meaningfully participate in the May meeting, that everyone worked cooperatively to develop the IEP, and that there had merely been disagreement, and eventually a written mistake, as to the service hours S.T. needed in a self-contained environment.  He stated that "meaningful participation in the decision making process under 34. C.F.R. § 300.513(a)(2)(ii) (2009) does not mean a certain outcome acceptable to a parent must result or that a misleading IEP cannot be drafted." (ALJ Decision 31.)

After concluding that the May IEP meeting ended without an agreement as to the number of hours that S.T. needed for special education, the ALJ explained that he believed that the evidence presented during the administrative hearing indicated that the July meeting was merely a continuation of the May meeting.  Specifically, the ALJ pointed to the participation of Ms. Angel, Mr. Hilly, and Mr. Divine, in both the May and July IEP meetings, as well as the parents and Dr. Solomon.  Moreover, the ALJ explained that the May meeting had ended without clarification as to FMS's ability to provide special education services during lunch, physical

11

education, and elective courses, and that he believed that the purpose of the July meeting would be to decide a placement after those questions were answered.  Lastly, the  ALJ appears to have been persuaded by the testimony of Ms. Angel that the thirty hours of self-contained special education listed on the May IEP was written at the instruction of the Brooke Grove principal, who "ran out of willingness to listen to [the team] go over and over" about it.  (Hr'g Tr. 794:13-16.)  The ALJ stated that MCPS had not retrofitted S.T.'s service hours and instead he found that once MCPS obtained the needed information about the services available at FMS that it presented that information at the July meeting and that the school representatives were satisfied that S.T.'s needs could be met at FMS.  On the other hand, he explained that the parents and Dr. Solomon were adamant and unwilling to change their position that S.T. needed a fully self-contained program at the May meeting, and that by the July meeting they "had emphatically rejected Farquhar and applied for admission to Ivymount."[5]  (ALJ Decision 35.)  Thus, the ALJ concluded that the Plaintiffs' reliance on *MM*, 303 F.3d at 523, in which the court found that although the school had committed a procedural defect by not having a completed IEP before the beginning of the student's school year, the child had suffered no loss in an educational benefit especially where the parents would not have accepted any FAPE except for reimbursement for a specific program, did not help support the Plaintiffs' case.

S.T.'s parents argue that the ALJ erred in his determination that MCPS did not violate the procedures of IDEA because he went beyond the written May IEP, gave undue weight to the credibility of the testimony of MCPS' witnesses that contradicted the written May IEP, and

---

[5] Apparently the parents submitted the application for Ivymount a week before the May meeting, and actually enrolled S.T. in Ivymount about a week before the July meeting.  Moreover, the application for Ivymount has a written notation that the parents intended to seek funding from MCPS.  The parents assert that they submitted the applications and enrolled S.T. before the meetings because of approaching deadlines.  Although this fact is not particularly significant in affecting the Court's decision, it raises some question as to whether the parents would have accepted a placement other than a private special education school.

found that the July meeting was a continuation of the May IEP meeting. However, the Court

believes that these purported errors do not support that the ALJ engaged in any irregular fact

finding process sufficient enough for this Court to override his decisions. As to the ALJ's error

in going beyond the written IEP, the parents rely on *A.K. ex rel J.K. v. Alexandria City School

Board*, in which the Fourth Circuit reiterated that "a court generally must limit its consideration

[of whether a school provided a FAPE] to the terms of the IEP itself." 484 F.3d 672, 682 (4th

Cir. 2007) (citing *County Sch. Bd. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 306 n. 5 (4th Cir. 2002);

*Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 768 (6th Cir. 2001). The Fourth

Circuit stated:

> [E]xpanding the scope of a district's offer to include a comment made
> during the IEP development process would undermine the important
> policies served by the requirement of a formal written offer, namely,
> 'creating a clear record of the educational placement and other services
> offered to the parents and assit[ing] parents in presenting complaints
> with respect to any matter relating to the educational placement of the
> child.

*A.K. ex rel J.K.* 484 F.3d at 682. The parents point to the Sixth Circuit's statement that "the

written offer helps to eliminate factual disputes between the school district and parents about

proposed placements." *Knable*, 238 F.3d at 768.

Although the Court agrees with Plaintiffs that the school district has an obligation to

develop clearly written IEPs, the IEP does not become complete until it identifies a placement

for where the child will receive special education services. *See* § 1414 (d)(1)(A)(vii). In this

case, the May IEP did not satisfy the requirements of an IEP because it did not identify a

placement for S.T. to receive special education services. The ALJ was convinced that the May

IEP was merely a draft, and that the July meeting was a continuation of the May meeting because

the decision concerning S.T.'s placement was referred to a CIEP meeting and some of the same

participants attended both meetings. The obligation of the reviewing court to limit its evaluation

of "whether the school provided a FAPE to the terms" of the written IEP appears to apply to the most complete version of a written IEP, which as discussed above the more complete IEP resulted from the July CIEP meeting.  Thus, the Court cannot find that the ALJ's consideration of the testimony of the May meeting participants as to whether thirty hours of self-contained special education was agreed to by the team was anything other than regular, especially since he considered the testimony of both the parents' and the school's witnesses on the subject.

Furthermore, the ALJ explained that he was more persuaded by MCPS's witnesses that the team did not agree to the fully self-contained program because several of the school employees, who worked with S.T. on a regular basis and in a school setting, found that she could benefit from mainstreaming in some areas.  Moreover, the Court notes that this case is unlike the ALJ's decision in *Kevin Coleman*,[6] in which an ALJ found that MCPS had violated the procedures of the IEP process because the school district offered no explanation for a "sudden change of heart" concerning the placement of a student during an IEP meeting.  Here, as outlined above, Ms. Stevens explained that she had not recorded disagreement regarding S.T.'s service hours because she did most of the presenting during the meeting, which made it difficult to fully capture the topics discussed.  Moreover, Ms. Angel explained that she filled in the IEP form with thirty hours of self-contained special education at the instruction of the Brooke Grove principal who grew frustrated with the dispute concerning the hours and that she intended for the statement explaining that the team felt that S.T. needed a restrictive environment to only apply to academic subjects.  The ALJ explained that he found Ms. Angel's and Ms. Stevens' testimony credible on this issue, and as the Defendants correctly asserts, the Court should defer to the ALJ's credibility decisions.  The Court finds no sufficient grounds to depart from the ALJ's credibility determinations, nor believes that there was anything irregular about the ALJ's fact-

---

[6] OAH NO: MSDE-MONT-OT-08-0085.

14

finding process.   Accordingly, the Court will uphold the ALJ's decision that MCPS did not violate the procedures of IDEA.

**II.    Substantive Violation - Denial of a FAPE**

**A.  S.T.'s Progress at Brooke Grove**

The parents argue that S.T. failed to gain meaningful educational benefits while at Brooke Grove, and that trivial improvements are insufficient under IDEA to provide the child with a FAPE.  First, they point to the decrease in S.T.'s performance on the WJ III test between second and fifth grade.   In response, MCPS highlights Ms. Stevens' testimony that younger students tend to perform better on that test, and that the older the student gets, the wider the gap between their ability to understand and process the information and to indicate that they possess age-appropriate skills.  The parents also rely on Ms. Stevens' testimony that S.T. made only two and a half years of reading progress while at Brooke Grove to support their position.   However, the school points to Ms. Stevens' testimony that S.T. had a good fifth grade year and that she made progress commensurate with her IQ level.  She also testified that S.T. met her fifth grade IEP goals in reading, math, and social behavior and made progress towards her communication/speech language goals.  Third, the parents point to a decrease in S.T.'s scores on the MSA between the third and fourth grade, and highlight that Ms. Stevens testified that this could mean that S.T. regressed.  However, the school counters that S.T. improved on the MSA between fourth and fifth grade.  Moreover, Ms. Stevens conducted a data-based assessment on S.T. in May 2006, which showed significant progress in reading, math, and writing.  In further support of its position, the school also relies on the testimony of Ms. Willis, S.T.'s speech and language therapist, that S.T. improved in her ability to orally formulate longer and more complex sentences.  Lastly, Ms. Katzman, S.T.'s occupational therapists, testified that it required little effort to work with S.T. because of improvements in her fine motor/visual skills.

The ALJ found the testimony of the educational professionals who worked with S.T. on a daily basis to be more persuasive than Dr. Solomon's, especially because the evidence supported that S.T. progressed.  In any event, the ALJ indicated that S.T. would not continue her education at Brooke Grove, but would attend a new school with a different teacher, and that her progress at Brooke Grove was only tangentially relevant to her progress in the future.  The Court believes that there is sufficient evidence to support the ALJ's determination that S.T. made progress commensurate with her disability and accordingly finds no reason to depart from the ALJ's decision.

**B.  July IEP was Reasonably Calculated to Provide a FAPE.**

The parents rely heavily on their contention that the May meeting ended with a consensus that S.T. needed thirty hours of self-contained special education that was suddenly, and without substantive discussion, changed in the July meeting, in which only one Brooke Grove representative who had personal knowledge of S.T. attended.  They essentially argue that this procedural error by itself is a denial of a FAPE, and that the ALJ ignored the gap in the credibility of MCPS' witnesses.  However, the Fourth Circuit requires the procedural violation to actually interfere with the parents' ability to participate in the educational development progress. The ALJ found that the parents and their advocate attended the July meeting, and were able to reassert their position that S.T. required a fully self-contained program that was not agreed to by MCPS team members.

The parents also argue that FMS's special education program would lack the intensity and structure that S.T. needed.  The parents visited FMS and testified that the students in the class were out of control and had behavioral issues, and furthermore, that Ms. McGuire, the special education teacher at FMS, described her class as "controlled chaos."  Dr. Solomon was also concerned that S.T. would be entirely unsupported during lunch at a large middle school.

Although the Court does not doubt the parents' representation that S.T. has made tremendous improvements at Ivymount, the IDEA statute provides reimbursement for parents' decision to place the child in a private school only if a court determines that the private placement is proper and that the proposed placement in public school was inappropriate. *Sch. Comm. v. Dept. of Educ.*, 471 U.S. 359, 370 (1985).  Here, the ALJ was persuaded by the testimony of Ms. McGuire, the special education teacher at FMS, that she had control of her class and that she would incorporate the teaching style recommended in the Children's report in her instruction of S.T.  The ALJ also found S.T.'s Brooke Grove teachers' testimony that mainstreaming would be beneficial to S.T. was credible and convinced him that FMS could sufficiently provide S.T. with a FAPE.  Accordingly, the Court finds no legal bases to disagree with the ALJ that FMS was an appropriate placement to meet S.T.'s special education needs, and denies the parents' request for reimbursement for tuition at Ivymount.

## **CONCLUSION**

For the foregoing reasons, the Court **DENIES** Plaintiffs' Motion for Summary Judgment and **GRANTS** Defendants' Cross-Motion for Summary Judgment.   A separate Order shall follow.


March 18, 2010                                              _____/s/_____
       Date                                                                Alexander Williams, Jr.
                                                                 United States District Judge